UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ANTHONY BENITEZ,                  :        Hon. Joseph H. Rodriguez

          Plaintiff,             :        Civil Action No. 13-2737

JMC RECYCLING SYSTEMS LTD., et al.,    :        OPINION

          Defendants.            :

This matter is before the Court on motion for summary judgment filed by
Defendant Strip Technology, Inc. [Dkt. No. 61].  The Court heard oral argument on the
motion on April 25, 2017 and the record of that proceeding is incorporated here.  For the
reasons placed on the record that day, and those set forth below, Strip Technology Inc.'s
motion for summary judgment will be denied.

## I.        Background

This case involves claims arising from a workplace accident which occurred on
May 5, 2011 when Plaintiff Anthony Benitez was operating a metal recycling machine
during the course of his employment at Former Defendant Doctor Copper, a metal
recycling facility in Pennsauken, New Jersey.  The metal recycling machine at issue is
described as an "alligator shear" and is manufactured and distributed by Former
Defendant JMC Recycling System Ltd.  Defendant Strip Tech is a vendor of recycling
equipment and sold the alligator shear at issue to Dr. Copper.  See Compl., Ex. A; see
also Alexander Dep. Tr., Ex. C, at 22:21 -23; 34:10-14; 14:7-9; 25:5-31:7

The alligator shear is a machine used to cut and manipulate scrap metal, of
various shapes and sizes, by placing the metal between two blades that resemble an
alligator's jaws. See Def. Sta. of Mat. Facts; Alligator Shear Operation and Maintenance

Manual, attached to Coleman Dec. as Ex. "D." The machine is operated through the use of a foot pedal that regulates the opening of the blades and the compression of the blades through a metal object. When the pedal is releases, the blades return to an open position. <u>See id.</u> at p. 1. The alligator shear machine is equipped with a safety guard, also referred to as a "cage guard" or blade guard" that covers the blades during operation, if it is manually pulled down. <u>See</u> Alexander Dep. Tr., Ex. C, at 44:5-45:2; <u>see also</u> Manual, Ex. D, at p. 18. If utilized, the cage guard also functions as an "infeed clamp," which holds down the metal material that is being inserted into the shear to allow the user to cut material without placing his or her hands near the blades. <u>See</u> Pl. Dep. Tr., Ex. B, at 46:9-22; <u>see also</u> Manual, Ex. D, at p. 18. Importantly, the machine operates even if the cage guard is not utilized.

The cage guard was not utilized on the day Plaintiff was injured. Benitez Dep. at 61:18-62:12. According to Plaintiff, he was injured when he was using the alligator shear to cut a copper pipe and he tripped on materials and debris on the floor, causing him to lose his balance. <u>See id.</u> at 72:25-73:3; 82:15 -85:13; 86:20-95:1. To brace himself for a fall, Plaintiff placed is left had onto the engaged alligator shear machine, causing significant injury to three fingers on his left hand. <u>See id.</u> at 86:20-95:1; 102:12-15.

As against moving Defendant Strip Tech, Plaintiff asserts violations of the New Jersey Products Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-2 (Counts II, II, IV), a claim of negligence (Count VI), and consumer fraud (Count V). Defendant JMC Recycling was dismissed from this action for lack of personal jurisdiction on April 10, 2015. The claims against Doctor Copper were voluntarily dismissed by Plaintiff. [Dkt. No. 10].

Strip Tech moves for summary judgment on all counts, arguing that it had Plaintiff fails to present admissible expert testimony to establish a *prima facie* case of product liability. Strip Tech argues that the testimony of Plaintiff's expert, George H. Meinschein, P.E. is unreliable, based entirely on speculation and unsupported conclusions rather than upon facts in the record and scientific methodology. Defendant argues, therefore, Plaintiff cannot establish proximate cause for his design defect and failure to warn claims. In addition, because Plaintiff fails to identify an affirmation or promise made by Strip Tech, summary judgment should be granted as to the breach of warranty claim.

In his Opposition papers and on the record during argument, Plaintiff conceded that summary judgment is appropriate on the claim of defective or inadequate warning and the claim for breach of express warranty. As a result, summary judgment is granted in favor of Strip Tech as to those claims. For the reasons that follow, the Court finds that genuine issues of material fact preclude summary judgement. Plaintiff's expert's testimony is admissible and questions of fact germane to the establishment of a *prima facie* case of product liability and on causation merit denial of the remained of Strip Tech's motion.

## II.    Standards of Review

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a showing must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, will fail to preclude the entry of summary judgment. Id.

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). Any such inferences "must flow directly from admissible evidence[,]" because "'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citing Anderson, 477 U.S. at 255)).

Accordingly, the moving party initially has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Again, to withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap

Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d

Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

Celotex, 477 U.S. at 322.  The movant can support the assertion that a fact cannot be

genuinely disputed by showing that "an adverse party cannot produce admissible

evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord

Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  Finally, "[t]he

standard by which the court decides a summary judgment motion does not change when

the parties file cross-motions."  United States v. Kramer, 644 F. Supp. 2d 479, 488

(D.N.J. 2008).  Consequently, the court's evaluation of the pending motions remains

unaltered: "the court must consider the motions independently and view the evidence

on each motion in the light most favorable to the party opposing the motion."  Id.

(citation omitted).

B.  The New Jersey Products Liability Act

> A manufacturer or seller of a product shall be liable in a product liability
> action only if the claimant proves by a preponderance of the evidence that
> the product causing the harm was not reasonably fit, suitable or safe for its
> intended purpose because it: a. deviated from the design specifications,
> formulae, or performance standards of the manufacturer or from

otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. § 2A:58C−2. Three causes of action are established under the Act: claims for design defect, manufacturing defect, or warnings defect. <u>Roberts v. Rich Foods, Inc.</u>, 654 A.2d 1365, 1380 (N.J. 1995).

A successful design defect claim under the NJPLA requires that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user. <u>Jurado v. Western Gear Works</u>, 619 A.2d 1312, 1317 (N.J. 1993). "Whether a product is defective depends on whether it 'is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes.'" <u>McGarvey v. G.I. Joe Septic Serv., Inc.</u>, 679 A.2d 733, 740 (N.J. Super. Ct. App. Div. 1996) (quoting <u>Jurado</u>, 619 A.2d at 1317). To establish a design defect at the summary judgment stage, a plaintiff must provide sufficient evidence such that a reasonable jury could find "either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." <u>Lewis v. American Cyanamid Co.</u>, 715 A.2d 967, 980 (N.J. 1998). The plaintiff thus bears a burden to demonstrate "under a risk-utility analysis the existence of an alternative design that is both practical and feasible." <u>Id.</u>

New Jersey courts use a seven-factor balancing test to determine whether a product is fit for its intended uses, considering:

(1) the usefulness and desirability of the product; (2) the likelihood and seriousness of injury; (3) the availability of a substitute product; (4) the

manufacturer's ability to eliminate the danger without impairing the product's utility; (5) the user's ability to avoid danger by due care; (6) the user's anticipated awareness of the danger considering general public knowledge or the obvious condition or the existence of suitable warnings or instructions; and (7) the feasibility of the manufacturer's spreading the loss by setting the price or carrying liability insurance.

McGarvey, 679 A.2d at 740 (citing Johansen v. Makita USA, Inc., 607 A.2d 637

(1992)).

C. Federal Rule of Evidence 702 and Daubert

The guiding principles that inform the Court's judgment are found in Federal

Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Consistent with that Rule, Daubert established a "trilogy of

restrictions" on the admissibility of expert testimony relating to scientific knowledge.

See Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003). This "trilogy"

consists of "qualification, reliability and fit." Id. The Third Circuit liberally construes the

qualifications of an expert, noting that "a broad range of knowledge, skills, and training

will qualify a witness as an expert ..." See Yarchak v. Trek Bicycle Corp., 208 F.Supp.2d

470, 495 (D.N.J. 2002) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d

Cir. 1994) ("Paoli II" )) (internal quotations omitted). The qualifications of Mr.

Meinschein are not at issue.

With respect to reliability, the focus is on the "principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. Four benchmarks help determine whether a theory or technique qualifies as "scientific knowledge" such that it will assist the trier of fact. See Daubert, 509 U.S. at 593. The Court considers: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the rate of error; and (4) whether the theory or technique has been generally accepted within the putative expert's respective community. Id. at 593–94. The Third Circuit adds other factors, including: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non judicial uses to which the method has been put. Paoli II, 35 F.3d at 742 n. 8. When considering these factors, the Court's inquiry must be a "flexible one." Id.

As for the third prong, Rule 702 requires that the "proffered expert testimony must 'fit' within the facts of the case." Yarchak, at 208 F.Supp.2d at 496. The fit requirement mandates that the testimony "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case." Id. (citing Magistrini v. One Hour Martinizing Dry Cleaning, 180 F.Supp.2d 584, 595 (D.N.J. 2002)). Thus, even if an expert is qualified and relies on sound methodology, he must still "apply this expertise to the matter at hand." See Calhoun, 350 F.3d at 324. These factors are not exclusive. They "are intended to serve only as 'useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.'" Yarchak, 208 F.Supp.2d at 495 (quoting Heller v. Shaw Industries, Inc., 167

F.3d 146, 152 (3d Cir. 1999)). With the help of these guideposts, the Court performs its essential gatekeeper role under Federal Rules of Evidence 702.

III.    <u>Analysis</u>

There are questions of fact related to whether Plaintiff satisfies his burden of demonstrating defective design by satisfying the "risk-utility" analysis and whether the design defect is a proximate cause of the accident.  In addition, the Court rejects Defendant Strip Tech's argument that Mr. Meinschein's opinion is an unreliable net opinion. Giving Plaintiff the benefit of every doubt and available inference, summary judgment is denied because reasonable jurors could disagree as to whether the reasonably foreseeable risk of harm posed by the reasonably foreseeable use of the product could have been reduced or avoided by a reasonably alternative design and whether the defective design is a proximate cause of the accident.

Here, the parties agree that the risks associated with the use of the machine are high and that operation of the machine can be hazardous.  The tension in this case is created by the fact that the cage guard was not operational and that there was debris in the area of the machine which created a tripping hazard for the operator. In addition, although the machine came with various operational guidelines and warnings, Plaintiff's employer Dr. Copper, which is not a party to this action, never properly trained Plaintiff on the use of the alligator shear and did not provide plaintiff with the Operations Manual.  <u>See</u> Pl. Dep. at 12.

Plaintiff testified that he never used the cage guard while operating the machine and never saw any of his co-corkers use the cage guard when operating the machine. <u>See</u> <u>id.</u> at 61:14-63:5; <u>see</u> <u>also</u> Manual, Ex. D, at p. 2-3, 9 & 18.

Q. Okay. Just to go back to what Gio told you in terms of how to operate the shear he told you how to turn it on by pressing the green button; correct?

A. Correct.

Q. Was there anything else that he told you about how to operate this machine?

A. No.

Q. Did anybody else at Dr. Copper provide you with any other information on how to operate the machine?

A. No, Ma'am.

Q. Did anybody ever tell you the type of metal that could be used in the machine?

A. No, Ma'am.

Q. Did anybody ever show you or tell you that this what I just referred to as a metal cage was a guard?

A. No.

Q. Did you ever use the guard when you operated the machine?

A. I've never used the guard and neither has anybody else cause it wasn't operable at the time. It was just there. I didn't even know what it was for.

Q. Okay. So during the entire time that you were at Dr. Copper you never saw anybody use this guard when using the shear?

A. Never.

Q. And during the entire time that you were at Dr. Copper you never used the guard when using the shear?

A. Never.

Q. Did you ever ask anybody what it was for?

A. Yes, I did. I asked Gio what it was for.

Q. And what did Gio tell you?

A. He said it was supposed to be a safety thing but it doesn't work.

Pl. Dep. at pp. 12, 62.

Plaintiff testified that Dr. Copper's owner advised him that the cage guard was intended to be a safety mechanism, but that it was not operational. See Pl. Dep. Tr. Ex. B, at 61:14-63:5. In addition, he stated that debris in the area of the machine was common.

Q. What about other days, did you frequently see debris in that area?

A. There was always debris.

Q. You said you tripped two to three times a shift when walking throughout the –

A. Correct.

10

Q. -- warehouse. Did you ever trip prior to the date of the accident near the alligator shear?

A. I've tripped plenty of times near it.

Q. What about while operating it, had you ever tripped before?

A. Well, the day I was injured, yeah. I got – same incident kind of happened prior to my injury. I used to always roll on the pipes that were on the floor.

Q. So the same day of your accident you tripped while operating or rolled on the pipes while operating the machine earlier that day?

A. Not that day but prior to, meaning it did happen so many – It was frequent within the three months that I worked there.

p. 74

Q. Did you ever talk to anyone from Dr. Copper about the fact that there was debris all over the floor while you were operating heavy machinery?

A. No. Complaints were not – Nobody every complained.

Id. at 74.

According to Plaintiff's expert, Mr. Meinschein, inadequate guarding, among other factors, caused the accident at issue. See Meinschein Rep, Ex. F. In particular, the fact that the machine is operational when the guard cage is not utilized creates an inherent danger, as seemingly recognized by Defendant's expert. See Dep. Karosas, p. 76: 8-21. Mr. Meinschein's report makes the following conclusion as to the risk-utility of the machine and its relation to the cause of the accident:

It is my opinion that the design of the alligator shear in this case could have been modified in accordance with the standard and accepted product design hierarchy to incorporate a guard that would have precluded access to the shear point and that would have prevented the accident wherein Mr. Benitez was injured. The article "Equipment Focus – Alligator Shears" that was published in the May/June 2003 issue of Scrap Magazine details protective cages, two-handed controls, and hand restraints as three techniques to safeguard operators of alligator shears. Of the three safeguarding techniques referenced in the article, it is my opinion that a protective cage or hand restraints offered feasible alternatives to the defective design of the subject alligator shear. Either of these safeguards would have prevented Mr. Benitez's accident and would have a negligible effect on the manufacturing cost of the shear.

In New Jersey, an injured plaintiff does not have " 'to prove a specific [design] defect.' " <u>Myrlak v. Port Auth. of N.Y. & N.J.</u>, 157 N.J. 84, 723 A.2d 45, 52 (1999) (citing <u>Scanlon v. General Motors Corp.</u>, 65 N.J. 582, 326 A.2d 673 (1974); <u>Manieri v. Volkswagenwerk A.G.</u>, 151 N.J. Super. 422, 376 A.2d 1317 (Ct. App. Div. 1977)). A showing that " 'something [is arguably] wrong' with the product[]" is sufficient. <u>Id.</u> (citation omitted). An injured "plaintiff asserting a design defect in a products liability action "must prove under a risk-utility analysis the existence of an alternate design that is both practical and feasible," and "safer" than that used by the manufacturer." <u>Diluzio-Gulino v. Daimler Chrysler Corp.</u>, 385 N.J. Super. 434, 438, 897 A.2d 438, 441 (App. Div. 2006) (quoting <u>Lewis v. Am. Cyanamid Co.</u>, 155 N.J. 544, 571, 715 A.2d 967 (1998).

Mr. Meinschein's opinion offers five alternative designs, all of which are utilized in the industry. Defendant's expert, Mr. Karosas seems to agree with the availability and utility of three of the alternatives: a portal gated cage, limiting switch, and a twohand control devices. <u>See</u> Karosis Rep., 57:24-58:15 (two handed controls), 41:7-43:4 (limiting switch), 48:25-50:20, 47:22-24 (portal cage). Mr. Meinschein also proposes a protective cage and hand restraints, which restrain the hands from moving under the shear. Against this evidence, a jury could conclude that "the reasonably foreseeable risk of harm posed by the reasonably foreseeable use of the product could have been reduced or avoided by. . ." one of the alternative designs offered by Mr. Meinschein. <u>Indian Brand Farms, Inc. v. Novartis Crop Prot. Inc.</u>, 617 F.3d 207, 227 (3d Cir. 2010) (citing <u>Lewis v. Am. Cyanamid Co.</u>, 155 N.J. 544, 715 A.2d 967, 980 (1998)) (emphasis in original); <u>see also</u> <u>Diluzio–Gulino</u>, 385 N.J. Super. 434, 897 A.2d at 441 (citation omitted).

Here, the fact that the machine was operable without engaging the safety cage is a foreseeable misuse of the product and Strip Tech owed Plaintiff a " 'duty to prevent an injury caused by the foreseeable misuse of its product' ." <u>Truchan v. Nissan Motor Corp. in U.S.A.</u>, 316 N.J. Super. 554, 720 A.2d 981, 985 (Ct. App. Div. 1998). In addition, common sense portends and it is foreseeable that a machine that cuts metal, of all sizes and shapes, will be operated in a setting that is not pristine or devoid of debris. In addition, if the machine is operable without the engagement of the safety function, common sense dictates that a foreseeable user will forgo utilizing the safety cage. <u>See Jurado v. Western Gear Works</u>, 131 N.J. 375, 619 A.2d 1312, 1317–1318 (1993) (discussing common sense examples of "product misuse"). On this record, the Court finds that the circumstances of Plaintiff's accident, using the machine without the safety cage in a debris filled setting are foreseeable. In addition, the record evidence demonstrates that the jury could find that the alternative designs, which Mr. Meinschein states could have eliminated the hazard posed by the machine at nominal cost, merit denial of Defendant's summary judgment motion on the basis of the risk-utility analysis. Meinschein Rep., Ex. F; Meinschein Dep., G, pp. 106-109.

For all of these reasons, the Court finds that the record evidence fails to demonstrate Defendant's entitlement to summary judgment on the question of design defect because Plaintiff makes a prima facie case of design defect and the record contains disputed issues of material fact to be resolved by the jury.

Likewise, summary judgment is denied on the issue of proximate cause. The record indicates several factors at play in the accident that injured Plaintiff. For example, the safety cage was not engaged, debris surrounded the machine, Plaintiff was never properly trained by his employer as to the use of the machine, and Plaintiff claims that

his steel-toed boot often became caught in the mechanism which engaged the pedal that

activated the shears.

> A.     I've always had an issue using the machine. The machine was very dangerous.  I mean I've had — my biggest problem was my boot getting stuck in the machine.  I had steel toe boots with a rubber toe and every time I would place my foot in this peg as you can see the lip in the metal I would place my foot in it and the top of my toe would get stuck on the top of this metal (indicating).
> Q.     Okay.
> A.     So pulling my foot out it would always get jammed in there.  I would have to either shake it out or just kind of — There was some kind of like little friction with my boot and the pedal (indicating).
> Q.     And just so the record is clear when you say peg we can just always say that you're talking about a pedal; right?
> A.     Yes.
> Q.     Okay.  And for the record you were pointing to the photograph Benitez-3.  Did you ever tell anybody that you were having this issue with your boot getting stuck in the pedal?
> A.     We spoke about it.


> Q.     I understand you didn't trip while operating the machine. Had you tripped earlier that day on debris that was all over the ground?
> A.     Not tripped and fell but tripped, yeah, and held my balance.  That was an everyday event.

Pl. Dep. 79-80.

> Plaintiff explains the accident as follows:

> I was cutting — I was cutting pipe.  I don't remember the exact gauge but, you know, I was cutting pipes and I think I was — I want to say it was a chair at the time we had to cut and, you know, just held — it was I guess a copper pipe about three feet, four feet long, three feet, yeah,
> about three feet long.  And I had to cut it in half. So I cut the pipe and I dropped the pipe on my left hand after I made the cut and my foot was in the peg.  And as soon as I made the cut the machine — the blade went up and somehow I tried to pull my foot out and it didn't come out.  My left leg stepped on a small little pipe, I don't remember what I stepped on.  I know I lost my balance and to not fall into the machine I kind of like — and not hit my face I fell into the machine and that's when my foot miraculously just came out of the machine.  Came off the peg and the machine went up after it already cut three of my fingers.  One was severed and the other two the bones were cut (indicating). . . . Then I want to remove my right foot. This all happened — I went to remove my foot from the pedal as the blade

was going up and I lost my footing with my left foot that was not in the peg. And when I lost my footing I dropped the right pipe because I knew I was going to fall and I lost my footing and placed my hands on the machine to prevent my face from getting hit by the corner of the machine.

Q.     Was your left foot stepped on something or was it flat on the surface?
A.     It was stepped – It was on debris.
Q.     It was on debris?
A.     Yes.
Q.     Do you know what kind of debris?
A.     Small pipes –

Q.     Okay.
A.     -- that rolled. Cause it wasn't under my foot obviously prior from me cutting copper pipe somehow. When I couldn't get my foot out of the pedal I moved my position a little bit and there was a pipe.
Q.     I see. So when your foot was stuck in the pedal do you think you put your weight back on your right foot –
A.     Yes.
Q.     -- at some point and then stepped back down on your left?
A.     Correct.
Q.     And that's when it stepped on top of the piping –
A.     Yes.
Q.     -- that caused you to fall?
A.     Yes.
Q.     So when you stepped back onto your right foot it would have depressed the pedal again, correct?
A.     Yes.
Q.     Causing the shear to close again, correct?
A.     Correct.


Pl. Dep. pp. 86-7; 92.

Although many factors may have contributed to this accident, proximate cause is established in a design defect case when the alleged defect acts as a substantially contributing or concurring cause of the injury. See Kemly v. Werner Co., 151 F. Supp. 3d 496, 507–08 (D.N.J. 2015) (citing N.J. Model Civil Jury Charges at § 5.401; Perez v. Wyeth Labs. Inc., 161 N.J. 1, 734 A.2d 1245, 1261 (1999) ("A proximate cause need not be the sole cause of harm. It suffices if it is a substantial contributing factor to the harm

suffered.")).  In <u>Kemly</u>, a worker, performing duties on a platform manufactured by the defendant, suffered injuries when he slipped and cut himself on the metal locking mechanism for the platform's collapsible legs. <u>Id.</u>  As to whether summary judgment was merited on the issue of proximate cause, the district court recounted the considerations applicable when competing factors contribute to an accident, apart from the defect alone.  "[F]or example, 'if, in the present case, the accident had happened when a co-employee negligently bumped plaintiff' while he dismounted the work platform, 'the manufacturer could [still] be found liable notwithstanding the untoward conduct of the co-employee.' <u>Id.</u> (quoting <u>Jurado</u>, 619 A.2d at 1319.)  Under this analysis, Strip Tech could still be found liable for a design defect, even though Plaintiff may have caused, or contributed to his own fall and the accident.

In other words, as noted in <u>Kemly</u>, the fact that defective design may have contributed to or amplified "the severity of Plaintiff's injuries, even if factors unconnected to the defect (like Plaintiff's own carelessness) primarily created the circumstances" undermines summary judgment. <u>Kemly</u>, 151 F. Supp. 3d at 507–08 (citing <u>Johnson v. Salem Corp.</u>, 97 N.J. 78, 477 A.2d 1246, 1255 (1984) (concluding, in a design defect case, that "the absence of a guard" constituted "at the very least a contributing casual factor in the happening of the accident").  The record in this case does not support granting summary judgment on the issue of proximate cause.  Strip Tech's motion is denied on this basis. <u>See, e.g.</u>, <u>Kaur v. Standex Int'l Corp.</u>, No. 06–2425, 2009 WL 2016073, *6 (D.N.J. July 7, 2009) (denying a motion for summary judgment based upon factual issues relative to proximate cause); <u>Cruz–Mendez v. ISU/Ins. Servs. of San Francisco</u>, 156 N.J. 556, 722 A.2d 515, 524 (1999) ("[T]he determination of proximate cause" is removed from the jury only "rare case[s].").

Finally, the Court denies Strip Tech's motion to preclude the testimony of Mr. Meinschein pursuant to <u>Daubert</u>. Strip Tech challenges the reliability of Mr. Meinschein's report on several grounds. Mr. Meinschein did not interview Plaintiff before he prepared the report and Strip Tech claims that there are inconsistencies in Mr. Meinschein's report as to the facts Plaintiff alleges occurred. <u>See</u> Ex. G, Meinschein Dep. at 41:2-42:25; <u>see</u> Ex. F, Meinschein Rep., at p. 1; <u>see also</u> Ex. B, Pl. Dep. Tr., at 86:20-95:1. 41. As to Mr. Meinschein's methodology, Strip Tech alleges that Mr. Meinschein speculates and did not provide sound, scientific methodology. In addition, Mr. Meinschein did not test the proposed alternative designs and, Defendant argues that he seemed uncertain as to which alternative was best. For example, Mr. Meinschein testified that "[t]here are an unlimited number of possibilities out there. I haven't done work to decide which one would be best." <u>Id.</u> at 121:4-8. All of these arguments form the basis for Strip Tech's <u>Daubert</u> motion.

Mr. Meinschein lists a number of items which informed his opinion. He relied upon the following in preparation of his report:

1. JMC Recycling Systems 320 Shear Product Brochure
2. JMC Recycling Systems 320, 500GT, 407i and 407 CAT Shear Operation and Maintenance Manual
3. Onsite Consultation Abatement Method Advice for: Metalworking Machinery, Michigan Occupational Safety & Health Administration, Consultation Education & Training Division OSC-6085 (Rev. 6/05)
4. Worker protection at crocodile (alligator) shears, Guidance Note PM 65, Health and Safety Executive, 1986
5. Purchase documentation for the subject shear (4 pages)
6. Equipment Focus – Alligator Shears, Scrap Magazine Archive, May/June 2003
7. Accident Prevention Manual, 11th Edition, National Safety Council, pages 4-5
8. Photographs from my April 9, 2013 physical examination of the subject alligator shear and accident site.

Ex. F, Meinschein Rep. p. 1.  Some of these references are attached to

Meinschein's Expert Report. Mr. Meinschein physically examined the machine.

He opines that "the design of the subject JMC Recycling Systems Model 320

Shear is defective due to inadequate guarding." Ex. F, Meinschein Rep., p. 2.

Then, Mr. Meinschein sets forth the basis for his proposed alternatives. "The

article 'Equipment Focus- Alligator Shears' that was published in the May/June

issue of Scrap Magazine details protective cages, two-handed controls, and hand

restraints as three techniques to safeguard operators of alligator shears." Id.

1. The design of the subject JMC Recycling Systems Model 320 shear is defective due to inadequate guarding.

2. The design of the subject alligator shear could have been modified in accordance with the standard and accepted product design hierarchy to incorporate a guard that would have precluded access to the shear point and that would have prevented the accident wherein Mr. Benitez was injured.

3. Feasible alternatives to the defective design of the subject alligator shear include a protective cage or hand restraints, either of which would have prevented Mr. Benitez's accident and would have had a negligible effect on the manufacturing cost of the shear.

Notably, while Mr. Meinschein opines as to the availability of a limiting switch in

deposition, that term does not appear in his report. Although "an expert is not strictly

limited to the precise words contained within an expert report, it is axiomatic that an

expert may not present new opinions on topics not timely included or otherwise

disclosed in the expert's report." Krys v. Aaron, 112 F. Supp. 3d 181, 207 (D.N.J. 2015)

(citing Fed.R.Civ.P. 26(a)(2)(B) (providing that an expert report "shall contain a

complete statement of all opinions to be expressed and the basis and reasons

therefore")).  During deposition, Mr. Meinschein clarified that the limiting switch

relates to the operation of the machine despite the protective guard not being engaged

or functional.

> Q. Even though that guard had not been lowered down, that machine was still operational?
> A. Correct.
> Q. Okay. Are you aware of anything that would either activate or deactivate the operation of a machine should a guard not by (sic) lowered?
> A. Sure.
> Q. What is it called?
> A. It's either a limit switch or a proximity switch or an inclination switch. Any one of them, in this case, would've done that.
> Q. Okay. And this machine did not have that?
> A. Correct.
> Q. What is the cost for that?
> A. The cost of the hardware, even the most simple one would be less than $10, let's say.

Ex. F., Meinschein Dep., 104:5-25.

Mr. Meinschein ties Defendant's conduct to Plaintiff's injury by virtue of the fact

that the machine, as designed, remains operable without the engagement of the

protective cage to the proximate cause of the accident.

> Q. Okay. With respect to that activator switch that triggers the use of the machine when the guard is lowered, is that mechanism to be provided by the manufacturer or by the end user?
> A. That would be the manufacturer.
> Q. Okay. With respect to the cage—or the guard—not the cage but the guard with the portal, is that, once again, something from the manufacturer's end or the end user's end?
> A. That would be the manufacturer.

Ex. F., Meinschein Dep., 135:13-25- 136:1.

Here, a protective cage was installed on the machine by Strip Tech. The record

evidence suggests, and the parties agree, that the guard, even when utilized, still exposes

the operator to a hazard because the machine is designed to cut objects of various sizes

leaving the guard in disparate positions of utility. In this instance, even Mr. Meinshein

agrees that when the accident occurred, even if the cage was employed, a window would have existed for Plaintiff's hand(s) to access the shears. Ex. G. Meinschein Dep., 49:15-25; Karosas Dep., 93:8-24. Although it appears from the record that the machine always dangerous, Mr. Meinschein states that had the guard "been lowered sufficiently so that when he did lose his balance, if he reached over and grabbed the guard instead of the edge of the table, that would've prevented that." Id. at 101:12-16. The fact that the machine was operable even when the guard was either not used or not functional is in Meinschein's opinion, evidence of a defect. Whether or not use of the guard would have prevented the accident at issue is a question for the jury. Mr. Meinschein's testimony in this regard is reliable, and to some degree based on common sense.

The remainder of Mr. Meinschein's opinion as it relates to the alternative design is thin, but bears an adequate indicia of reliability which satisfies Fed. R. Evid. 702. The Court notes that the Rules of Evidence encourage admissibility and do not require an expert to demonstrate the correctness of their opinion. Id. Certainly, as demonstrated in deposition, Mr. Meinschein's testimony is at times confusing, but that confusion appears to be the byproduct of Meinschein and opposing counsel holding different definitions of some of the protections offered as alternatives. For example, a large part of the Meinschein's deposition centers on the contours of a "protective cage" versus a "protective guard." Meinschein clarifies on cross examination that his references are consistent with the article attached to his report, but there is record evidence of conflation of the terms by Mr. Meinschein and opposing counsel. Ex. F., Meinschein Dep., 102: 6-25. Given Mr. Meinschein's references to relevant industry recommendations, which are already in the market place on some machines, the Court finds the testimony reliable. Opposing counsel's attempt to undermine Mr. Meinschein's

testimony is not without force as to the weight of the testimony, but does not sufficiently undercut reliability for evidentiary purposes. Mr. Meinschein will be subject to vigorous cross-examination during trial, but given Mr. Meinschein's references to relevant industry recommendations and because Defendant's Expert, Mr. Karosas seems to agree to the availability and use of a portal gated cage and two hand control devices, and a limiting switch, an adequate indicia of reliability exists. See Ex. F. Meinschein Dep., 106:24-107:1-24; Karosas Dep., 41:7-43:4; 105:17-106:9; 50:16-51:1.

Finally, Strip Tech's attack on the reliability of the alternatives, because Mr. Meinschein did not perform any tests, does not render Mr. Meinschein's opinion unreliable *per se.* This Court has previously noted that testing demonstrates scrupulous scientific inquiry. Kolokowski v. Crown Equip. Corp., No. CIV.A 05-4257, 2009 WL 2857957, at *7 (D.N.J. Aug. 27, 2009). It also demonstrates the feasibility of the proposed alternative design. Id. However, testing is not necessary where the alternative design is on the market, or recognized in the industry, performing "the same or very similar function at lower risk and comparable cost." Ixcopal v. Crown Equip. Corp., No. A-2208-14T3, 2017 WL 1456965, at *5 (N.J. Super. Ct. App. Div. Apr. 25, 2017) (quoting Green v. General Motors Corp., 310 N.J. Super. 507, 524–25 (App. Div.), certif. denied, 156 N.J. 381 (1998) (quoting Restatement (Third) of Torts: Products Liability § 2 comment f)).

Here, because the alternatives are recognized within the industry and Strip Tech's expert Mr. Karosis agrees, at least in part, to the utility of at least three of the five proposals, Mr. Meinschein's failure to test does not undermine the reliability of his proposals in this case. See Meadows v. Anchor Longwall and Rebuild, Inc., 306 Fed. Appx. 781, 788 (3d Cir. Jan.13, 2009) (observing evidence of industry practice is useful

in evaluating reliability in cases where technical issues like engineering arise (citing

Pineda v. Ford Motor Co., 520 F.3d 237, 248 (3d Cir. 2008))). As a result, Strip Tech's

motion for summary judgment [61] will be denied.

     An appropriate Order shall issue.


Dated:  June 28, 2017

                               s/ Joseph H. Rodriguez
                               HON. JOSEPH H. RODRIGUEZ,
                               United States District Judge